COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-09-169-CV

 

 

HARVEY G. DAVISSON, PH.D.                                             APPELLANTS

AND ANGELA DONNA SELF, M.D.

AND THE DAVISSON CLINIC                                                                 

 

                                                   V.

 

JAMES T. NICHOLSON,                                                        APPELLEES

INDIVIDUALLY, AND PATRICIA 

NICHOLSON, INDIVIDUALLY AND 

AS NEXT FRIEND OF JASON 

THOMAS NICHOLSON AND RYAN 

JAMES NICHOLSON, MINORS                                                                

 

                                              ------------

 

           FROM
THE 348TH DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                OPINION ON REHEARING

 

                                              ------------

After
considering the motion for rehearing filed by appellant Harvey G. Davisson,
Ph.D., we deny the motion, but we withdraw our prior opinion and judgment of
February 4, 2010 and substitute the following.








This is
an interlocutory appeal from the trial court=s order
denying appellants= motions to dismiss for failure
to timely file an adequate expert report in this health care liability
case.  See Tex. Civ. Prac. &
Rem. Code Ann. ' 51.014(a)(9) (Vernon
2008).  We affirm in part and reverse and
remand in part.

                             Factual and
Procedural Background








On
November 24, 2008, appellees James T. Nicholson and his wife Patricia[1]
filed a health care liability claim against appellants Harvey G. Davisson,
Ph.D., Angela Donna Self, M.D., and The Davisson Clinic (the Clinic).[2]  The Nicholsons alleged that in February 2003,
James responded to a radio advertisement by Dr. Davisson and went to the Clinic
complaining of Afeeling stressed and having an
inability to concentrate.@ 
Dr. Davisson diagnosed James with Attention Deficit Disorder (ADD), and
Dr. Ferrell prescribed him Adderall.  The
Nicholsons further alleged that between February 2003 and February 2008,
appellants were negligent by continuing Ato
provide medical care and treatment@ to
James and Aby providing continued
prescriptions for Adderall,@ despite
collectively having seen James in the office only two or three times during
that five-year period.  The Nicholsons
claimed that this negligence caused James to develop Adderall addiction and
psychosis.

Their
specific allegations of negligence faulted appellants for the following:

$       
Failing to timely and properly diagnose James;

$       
Diagnosing James with ADD;

$       
Continuing to diagnose James with ADD;

$       
Failing to adequately or properly assess,
monitor, and treat James; and

$       
Continuing to prescribe Adderall without timely
and properly seeing James for medical and psychiatric evaluation.

The Nicholsons also generally
alleged respondeat superior liability as follows:

Whenever in this Petition it is alleged that a
Defendant did any act or thing, it is meant that said Defendant, or its agents,
servants, employees or representatives did such act or thing and that at the
time such act or thing was done, it was done with full authorization or
ratification of that Defendant or was done in the normal routine or course and
scope of employment of that Defendant or its agents, servants, employees or
representatives. [[3]]


 








The
Nicholsons filed two expert reports on March 23, 2009:  one from a psychologist, Dr. Swen Helge, and
the other from an internal medicine specialist, Dr. Lige B. Rushing, Jr.  All three appellants objected to both
reports. After a hearing, the trial court overruled all of appellants=
objections to the reports and refused to dismiss the claims against each of the
appellants. Appellants appeal the trial court=s
refusal to dismiss the Nicholsons= claims
against them.

                                         Issues
on Appeal

Dr.
Davisson and the Clinic each bring three issues challenging the adequacy of
both Dr. Helge=s and Dr. Rushing=s expert
reports as to causation and each expert=s
qualifications to render expert opinions on the standard of care applicable to
Dr. Davisson and the manner in which he allegedly breached that standard of
care.  Dr. Self brings a single issue
challenging the adequacy of Dr. Rushing=s
report, alleging specifically that the report fails to show that he is
qualified to give an opinion as to the applicable standard of care and that his
opinion on causation is conclusory.

                                       Standard
of Review








A trial
court=s
decision on a motion to dismiss under section 74.351 is subject to an abuse of
discretion standard.  See, e.g., Am.
Transitional Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 875 (Tex.
2001); Craig v. Dearbonne, 259 S.W.3d 308, 310 (Tex. App.CBeaumont
2008, no pet.); San Jacinto Methodist Hosp. v. Bennett, 256 S.W.3d 806,
811 (Tex. App.CHouston [14th Dist.] 2008, no
pet.); Lal v. Harris Methodist Fort Worth, 230 S.W.3d 468, 471 (Tex.
App.CFort
Worth 2007, no pet.).  Additionally, a
trial court=s decision on whether a
physician is qualified to offer an expert opinion in a health care liability
claim is reviewed under an abuse of discretion standard.  See Mem=l
Hermann Healthcare Sys. v. Burrell, 230 S.W.3d 755, 757 (Tex. App.CHouston
[14th Dist.] 2007, no pet.).

To
determine whether a trial court abused its discretion, we must decide whether
the trial court acted without reference to any guiding rules or principles; in
other words, we must decide whether the act was arbitrary or unreasonable.  Downer v. Aquamarine Operators, Inc.,
701 S.W.2d 238, 241B 42 (Tex. 1985), cert. denied,
476 U.S. 1159 (1986).  Merely because a
trial court may decide a matter within its discretion in a different manner
than an appellate court would in a similar circumstance does not demonstrate
that an abuse of discretion has occurred. 
Id. at 242.  A trial court
does not abuse its discretion if it commits a mere error in judgment.  See E.I. du Pont de Nemours & Co. v.
Robinson, 923 S.W.2d 549, 558 (Tex. 1995).








                                          Applicable
Law

In a
health care liability claim, a claimant must serve on each defendant an expert
report that addresses standard of care, liability, and causation no later than
the 120th day after the claim is filed. 
Tex. Civ. Prac. & Rem. Code Ann. '
74.351(a), (j) (Vernon Supp. 2009); Barber v. Mercer, No.
02-08-00079-CV, 2009 WL 3337192, at *3 (Tex. App.CFort
Worth Oct. 15, 2009, no pet.).  If an
expert report has not been served on a defendant within the 120‑day
period, then on the motion of the affected defendant, the trial court must
dismiss the claim with prejudice and award the defendant reasonable attorney=s fees
and costs.  Tex. Civ. Prac. & Rem.
Code Ann. ' 74.351(b); Barber,
2009 WL 3337192, at *3.  A report Ahas not
been served@ under the statute when it has
been physically served but it is found deficient by the trial court.  Lewis v. Funderburk, 253 S.W.3d 204,
207B08 (Tex.
2008); Barber, 2009 WL 3337192, at *3. 
When no report has been served because the report that was served was
found to be deficient, the trial court has discretion to grant one thirty-day
extension to allow the claimant the opportunity to cure the deficiency.  Tex. Civ. Prac. & Rem. Code Ann. '
74.351(c); Barber, 2009 WL 3337192, at *3.








A report
is deficient (therefore subjecting a claim to dismissal) when it Adoes not
represent an objective good faith effort to comply with the definition of an
expert report@ in the statute.  Tex. Civ. Prac. & Rem. Code Ann. ' 74.351(l);
Barber, 2009 WL 3337192, at *3. 
While the expert report Aneed not
marshal all the plaintiff=s proof,@ Palacios,
46 S.W.3d at 878, it must provide a fair summary of the expert=s
opinions as to the Aapplicable standards of care,
the manner in which the care rendered by the physician or health care provider
failed to meet the standards, and the causal relationship between that failure
and the injury, harm, or damages claimed.@  Tex. Civ. Prac. & Rem. Code Ann. '
74.351(r)(6); Barber, 2009 WL 3337192, at *3.








To
qualify as a good faith effort, the report must Adiscuss
the standard of care, breach, and causation with sufficient specificity to
inform the defendant of the conduct the plaintiff has called into question and
to provide a basis for the trial court to conclude that the claims have merit.@  Palacios, 46 S.W.3d at 875; Barber,
2009 WL 3337192, at *3.  A report does
not fulfill this requirement if it merely states the expert=s
conclusions or if it omits any of the statutory requirements.  Palacios, 46 S.W.3d at 879; Barber,
2009 WL 3337192, at *3.  The information
in the report Adoes not have to meet the same
requirements as the evidence offered in a summary‑judgment proceeding or
at trial.@ 
Palacios, 46 S.W.3d at 879; Barber, 2009 WL 3337192, at
*3.  When reviewing the adequacy of a report, the only information
relevant to the inquiry is the information contained within the four corners of
the document alone.  Palacios, 46
S.W.3d at 878; Barber, 2009 WL 3337192, at *3; see Bowie Mem=l Hosp.
v. Wright, 79 S.W.3d 48, 52 (Tex. 2002). 
This requirement precludes a court from filling gaps in a report by
drawing inferences or guessing as to what the expert likely meant or
intended.  Barber, 2009 WL
3337192, at *3; see Austin Heart, P.A. v. Webb, 228 S.W.3d 276, 279
(Tex. App.CAustin 2007, no pet.) (citing Bowie
Mem=l Hosp., 79
S.W.3d at 53).

                                               Analysis

Standard of Care[4]








The
Clinic and Dr. Davisson each contend that (1) the Helge report does not
demonstrate that Dr. Helge is qualified to offer an expert opinion regarding
the accepted standards of care for the diagnosis, care, or treatment of ADD,
the prescribing of Adderall to treat adult ADD, Adderall addiction, Adderall
psychosis, or all of these; (2) the Helge report fails to set forth the
specific standard of care applicable to each of the doctors and the Clinic; and
(3) the report fails to set forth the specific manner in which the doctors and
Clinic employees failed to meet the applicable standard of care.  They, along with Dr. Self, also challenge Dr.
Rushing=s
qualifications to opine to the standard of care applicable to each of them.

Dr.
Helge=s Qualifications

An
expert report concerning standards of care Aauthored
by a person who is not qualified to testify . . . cannot constitute an adequate
report.@  See Moore v. Gatica, 269 S.W.3d 134,
140 (Tex. App.CFort Worth 2008, pet. denied); In
re Windisch, 138 S.W.3d 507, 511 (Tex. App.CAmarillo
2004, orig. proceeding); see Ehrlich v. Miles, 144 S.W.3d 620, 624B25 (Tex.
App.CFort
Worth 2004, pet. denied).  To be
qualified, an expert must satisfy the requirements in section 74.402.  Tex. Civ. Prac. & Rem. Code Ann. ' 74.402
(Vernon 2005); Terry A. Leonard, P.A. v. Glenn, 293 S.W.3d 669, 678 (Tex.
App.CSan
Antonio 2009, pet. filed).  Specifically, section 74.402(b)(1)
requires an expert to have been

practicing health care in a field of practice that involves the same
type of care or treatment as that delivered by the defendant health care
provider, if the defendant health care provider is an individual, at the time
the testimony is given or was practicing that type of health care at the time
the claim arose.

 

Tex. Civ. Prac. & Rem. Code
Ann. ' 74.402(b)(1).








As to
Dr. Helge, the Clinic and Dr. Davisson specifically contend that Dr. Helge is
not practicing health care in a field of practice involving the same type of
care or treatment as that delivered by the doctors in this case, that Dr. Helge
does not have knowledge of the accepted standards of care for health care
providers for such matters, and that he is not qualified on the basis of
training or experience to offer an expert opinion on the accepted standards of
care.








Dr.
Helge has been a practicing clinical psychologist for the past thirty-seven
years in addition to being a practicing forensic psychologist for the past
twenty-four years.  Although the Clinic
and Dr. Davisson claim that Dr. Helge=s most
recent expertise is in forensic psychology as opposed to clinical psychology,
Dr. Helge=s report and curriculum vitae
show that at the time he authored the report, he had a private clinical
practice in psychology and was a member of the division of clinical psychology
and division of psychotherapy of the American Psychological Association.  Although many of his more recent diplomates
and papers involved forensic psychology, nothing in his report or curriculum
vitae shows that he was practicing forensic psychology to the exclusion of
clinical psychology.[5]  Thus, we conclude that the trial court did
not abuse its discretion by overruling this objection to Dr. Helge=s
qualifications. See id.; Benish v. Grottie, 281 S.W.3d 184, 206
(Tex. App.CFort Worth 2009, pet. denied); Foster
v. Zavala, 214 S.W.3d 106, 113 (Tex. App.CEastland
2006, pets. denied) (holding, based on legislative history and statutory
construction principles, that the statute does not require that expert be in
same field of practice, only a field involving the same type of care or
treatment).

Dr.
Davisson and the Clinic also challenge Dr. Helge=s
knowledge of the accepted standard of care for ADD treatment, care, and
diagnosis, including the use of Adderall in such treatment.  According to the Clinic, although Dr. Helge
states that he has had the occasion to see and evaluate patients who have had
Adderall prescribed for them in the regular course of his psychological
practice, he does not explain how seeing those patients, or how being familiar
with the pharmacology of amphetamines and their adverse effects, Aprovides
him with the knowledge of the accepted standards of care for providing
diagnosis, care, and treatment to an adult diagnosed with ADD and prescribed
Adderall, or Adderall addiction or Adderall psychosis.@

Section
74.402(c) states that

[i]n determining whether a witness is qualified on the basis of
training or experience, the court shall consider whether, at the time the claim
arose or at the time the testimony is given, the witness:

 

(1) is certified by a licensing agency of one or
more states of the United States or a national professional certifying agency,
or has other substantial training or experience, in the area of health care
relevant to the claim; and

 

(2) is actively practicing health care in
rendering health care services relevant to the claim.








Tex. Civ. Prac. & Rem. Code
Ann. ' 74.402(c).  Dr. Helge meets both of these requirements;
he is certified by the State of Texas as a psychologist, and he treats patients
who have been prescribed Adderall. 
Although Dr. Helge does not prescribe Adderall himself, his report
states that he has practical knowledge of what is customarily and usually done
by a practitioner under circumstances similar to those confronting the
defendant doctors.  See Ehrlich,
144 S.W.3d at 625; see also Barber, 2009 WL 3337192, at *6, 8.








Dr.
Davisson is a psychologist, as is Dr. Helge. 
Appellees allege that after diagnosing James with ADD and recommending a
prescription for Adderall, as evidenced by Dr. Davisson=s
signature along with Dr. Ferrell=s on the
notes setting forth the diagnosis and prescription recommendation,[6]
Dr. Davisson failed to provide any followup care or evaluation of James.  Having treated patients in his clinical
psychology practice who have been prescribed Adderall, Dr. Helge is thus at
least qualified to opine to the ongoing standard of care for a psychologist who
has made a diagnosis for which the patient was prescribed Adderall by a medical
doctor.  See Tex. Civ. Prac. &
Rem. Code Ann. ' 74.402(c); Terry A.
Leonard, P.A., 293 S.W.3d at 680; Grindstaff v. Michie, 242 S.W.3d
536, 542 (Tex. App.CEl Paso 2007, no pet.); Burrell,
230 S.W.3d at 760B61.

Dr.
Davisson and the Clinic also contend that the Helge report does not demonstrate
that Dr. Helge is qualified on the basis of training or experience to offer an
expert opinion on the accepted standards of care in that he does not explain how
his experience or training, which they claim is overwhelmingly in the field of
forensic psychology, provides him the necessary training or experience with the
omissions alleged here:  involving the
diagnosis, care, and treatment of an adult diagnosed with ADD and prescribed
Adderall, Adderall addiction, or Adderall psychosis.  However, the Clinic and Dr. Davisson fail to
read the report and Dr. Helge=s
curriculum vitae as a whole.  Dr. Helge=s
curriculum vitae shows that he is a practicing psychologist and that he has
treated patients who are taking Adderall prescribed by a doctor.   As such, he meets the requirements of
section 74.402 as to the Clinic=s
principal, Dr. Davisson, at least.  Tex.
Civ. Prac. & Rem. Code Ann. ' 74.402;
see Barber, 2009 WL 3337192, at *6 (holding that court must not view any
one part of expert report or curriculum vitae in isolation).








Dr. Helge=s
Articulation of Standard of Care

Dr.
Davisson and the Clinic further claim that the Helge report fails to provide a
fair summary of Dr. Helge=s opinions regarding the
standard of care for each defendant and how each of them specifically breached
that standard of care.  Dr. Helge opined
as follows regarding the standard of care:

a.      The standard of care
requires that [James=s] psychologist, Dr.
Harvey G. Davisson, provide that level of care and treatment that a reasonably
prudent psychologist would provide under the same or similar
circumstances.  The prescription of
controlled substances and particularly amphetamines on a chronic basis requires
careful monitoring and supervision.  This
means that the patient should be seen at a minimum of every 180 days and
depending on the clinical status, possibly more often in order to meet the
standard of care.

 

b.     The standard of care
requires . . . [James] to be seen and examined every 180 days and assessed for
adverse effects from the amphetamines such as amphetamine psychosis, including
any change in sociological factors.

 

c.      The standard of care also
requires that appropriate clinical records be kept in accordance with
acceptable professional standards.  These
records need to, in order to meet the standard of care, clearly reflect the
patient=s clinical status, the
medicines being received, his emotional or psychological status, his response
to treatment or lack of response and evidence of any adverse effects or the
absence of adverse effects must be documented.

 








Dr.
Davisson and the Clinic contend that because the report goes on to state that Athe care
rendered by the Davisson Clinic, its employees, and Harvey G. Davisson, Ph.D.
failed to meet the standard of care . . . [in that] the Davisson Clinic, its
employees, and Harvey G. Davisson, Ph.D. failed to examine and assess . . .
[James] every 180 days in [an] appropriate timely manner,@ it does
not delineate between the standards of care applicable to the various
defendants.  But as we have stated, Dr. Helge is a psychologist, like
Dr. Davisson, and he articulates the standard of care for a psychologist,
specifically Dr. Davisson, in his report. 
Thus, he clearly articulates the standard of care as it relates to Dr.
Davisson.  Because the Nicholsons= claims
against the Clinic are based on respondeat superior, and, thus, through the
alleged negligence of Dr. Davisson as well as Dr. Self, the report is therefore
not deficient for failing to set forth a standard of care as to anyone other
than Dr. Davisson.  See Gardner v.
U.S. Imaging, Inc., 274 S.W.3d 669, 671B72 (Tex.
2008); Univ. of Tex. Sw. Med. Ctr. v. Dale, 188 S.W.3d 877, 879 (Tex.
App.CDallas
2006, no pet.); see also Ctr. for Neurological Disorders, P.A. v.
George, 261 S.W.3d 285, 295 (Tex. App.CFort
Worth 2008, pet. denied).








Moreover,
the same reasoning applies to Dr. Helge=s
articulation of the breach of the standard of care, which provides a fair
summary as to Dr. Davisson:  as a
psychologist monitoring a person for whom he had diagnosed as having ADD and
who he knew was being prescribed Adderall,[7]
Dr. Davisson failed to examine James every one hundred eighty days for signs of
adverse effects from the amphetamines, including social factors.  It is undisputed that Dr. Helge=s
summary of the notes and records in James=s file
shows that there are no entries indicating Dr. Davisson examined James after
the initial diagnosis.  And because the
claims against the Clinic are based solely on respondeat superior, including
through the alleged negligence of Dr. Davisson, Dr. Helge=s
inclusion of the Clinic in his articulation of Dr. Davisson=s breach
of the standard of care does not fail to inform Dr. Davisson of his specific
conduct that breached the standard of care. 
See, supra, page 15.

Accordingly,
we conclude and hold that the trial court did not abuse its discretion by
overruling Dr. Davisson=s and the Clinic=s
objections to Dr. Helge=s report based on his
qualifications and articulation of the standard of care as to their claim that
Dr. Davisson failed to Aadequately or properly assess,
monitor, and treat James.@

Dr.
Rushing=s Qualifications








The
Clinic and Dr. Davisson likewise challenge Dr. Rushing=s
qualifications to give an expert opinion on the standard of care applicable to
Dr. Davisson.  They further contend that his report is deficient as
to Dr. Davisson because it only sets forth a standard of care for Dr. Self, Dr.
Mercau, and the Clinic, rather than Dr. Davisson, and because it fails to set
forth the specific manner in which Dr. Self, Dr. Mercau, and the Clinic=s
employees failed to meet the applicable standard of care.  Dr. Self also challenges Dr. Rushing=s
qualifications to opine as to an applicable standard of care.

To be an
Aexpert@ on the
departure from a physician=s
standard of care, a person must be a physician who

(1) is practicing medicine at the time such testimony is given or was
practicing medicine at the time the claim arose;

 

(2) has knowledge of accepted standards of medical care for the
diagnosis, care, or treatment of the illness, injury, or condition involved in
the claim; and

 

(3) is qualified on the basis of training or experience to offer an
expert opinion regarding those accepted standards of medical care.

 

Tex. Civ. Prac. & Rem. Code
Ann. ' 74.351(r)(5)(A),
'
74.401(a) (Vernon 2005).  In determining
whether a physician is qualified on the basis of training or experience, courts
must consider whether the physician who completed the report (1) is board
certified or has other substantial training or experience in an area of medical
practice relevant to the claim, and (2) is actively practicing medicine in
rendering medical care services relevant to the claim.  Id. '
74.401(c).  In other words,








there is no validity, if there ever was, to the notion that every
licensed medical doctor should be automatically qualified to testify as an
expert on every medical question. . . . 
[T]he proponent of the testimony has the burden to show that the expert
possesses special knowledge as to the very matter on which he proposes to give
an opinion.

 

Ehrlich, 144
S.W.3d at 625 (quoting Broders v. Heise, 924 S.W.2d 148, 152B53 (Tex.
1996)); see Barber, 2009 WL 3337192, at *4.  For this reason, the offered report (along
with the physician=s curriculum vitae) must
generally demonstrate that the expert has Aknowledge,
skill, experience, training, or education regarding the specific issue before
the court which would qualify the expert to give an opinion on that particular
subject.@  Ehrlich, 144 S.W.3d at 625
(quoting Roberts v. Williamson, 111 S.W.3d 113, 121 (Tex. 2003)); see
Tex. R. Evid. 702; Barber, 2009 WL 3337192, at *4.

However,
Athere
are certain standards of medical care that apply to multiple schools of
practice and any medical doctor.@  Blan v. Ali, 7 S.W.3d 741, 746 (Tex.
App.CHouston
[14th Dist.] 1999, no pet.).  Therefore,
a physician Awho is not of the same school of
medicine [as the defendant] . . . is competent to testify if he
has practical knowledge of what is usually and customarily done by a
practitioner under circumstances similar to those confronting the defendant.@  Ehrlich, 144 S.W.3d at 625; see
also Marling v. Maillard, 826 S.W.2d 735, 740 (Tex. App.CHouston
[14th  Dist.] 1992, no writ).








Appellants
contend that the Rushing report does not show that Dr. Rushing is qualified to
offer an expert opinion regarding the accepted standards of care applicable to
each of them because it does not show that he is familiar with Athe
specific issues involved in the claim.@  Specifically, they contend that he is not
practicing health care in a field of practice that involves the same type of
care or treatment as that delivered by the doctors, that he does not have
knowledge of the accepted standards of care regarding ADD, Adderall
prescription, or Adderall psychosis, and that he is not qualified on the basis
of training or experience to offer an expert opinion regarding those standards.

Dr.
Rushing=s
curriculum vitae shows that he is board certified in internal medicine, geriatrics,
and rheumatology and is an attending physician at Presbyterian Hospital in
Dallas.  His report states that he has
been practicing medicine since he graduated from medical school in 1951 and has
provided primary medical care for more than 10,000 patients in a hospital
setting and Amany more than that@ in an
office setting.  Dr. Rushing also states
that he is familiar with the pharmacology of amphetamines and the adverse
effects they produce.  He also offers,








In the regular course of my
medical practice I have occasion to see and evaluate patients who have had
Adderall prescribed for them for attention deficit disorder.  I have three such patients currently
in my practice who are receiving Adderall prescribed by the psychiatrist for
their attention deficit disorder.  I see
these patients for their regular medical problems and provide their primary
medical care.   [Emphasis added.]     

Dr.
Rushing=s report
and curriculum vitae show that he was (a) actively and currently practicing
medicine at the time it was written, (b) has actually treated and was currently
treating patients being prescribed Adderall specifically for ADD, and (c) is
board certified in internal medicine. 
Thus, he meets the requirements set forth in section 74.401(a) and (c)
for being qualified to render an opinion as to the standard of care applicable
to the treatment of a person diagnosed with ADD and being prescribed
Adderall.  See Tex. Civ. Prac.
& Rem. Code Ann. ' 74.401(a), (c); Terry A.
Leonard, P.A., 293 S.W.3d at 677; cf. Barber, 2009 WL 3337192, at *8
(holding that anesthesiologist who had participated in numerous similar
surgeries and had observed proper padding and positioning technique as part of
surgical team was qualified to provide expert report as to standard of
care applicable to general surgeon).








Appellants
contend that because Dr. Rushing is not the person who actually prescribed the
Adderall to his patients, he is not qualified to opine regarding the standard
of care for this claim.  But the statute
does not go so far.  Dr. Rushing=s report
shows he is actively involved in the management of care for persons who are
being prescribed ADD medication, specifically Adderall; this experience is
sufficient to allow him to opine on the applicable standard of care in a claim
that relates to the medical supervision and management of persons with such a
diagnosis and prescriptions.[8]  See San Jacinto Methodist Hosp., 256
S.W.3d at 813B14.  Thus, we conclude and hold that Dr. Rushing
is qualified to opine on the applicable standard of care for a doctor who has
not only prescribed Adderall to a patient, but who also manages the care of a
patient for whom that doctor has prescribed Adderall.[9]

Dr. Rushing=s
Articulation of Standard of Care

Next,
Dr. Davisson and the Clinic contend that the Rushing report fails to set forth
the specific standard of care applicable to each of the defendants and the
Clinic as well as the specific manner in which each breached the standard of
care.








Because
Dr. Rushing is an internal medicine specialist, his report was offered
primarily to articulate the standard of care for Dr. Self and Dr. Mercau,
although he did opine as to the standard of care applicable to
Dr. Davisson.  Because we have already determined that Dr. Helge=s report
sufficiently articulated the standard of care and breach as to Dr. Davisson, we
will focus on whether Dr. Rushing sufficiently articulated the standard of care
and breach as to Dr. Self.

Dr. Rushing
opined as follows:

1.     (Applicable standard of
care):

a.      The standard of care requires that . . . Angela D. Self, M.D.
. . . provide that level of care and treatment that a reasonable prudent
physician would provide under the same or similar circumstances.  The prescription of controlled substances and
particularly amphetamines on a chronic basis requires careful monitoring and
supervision.  This means that the patient
should be seen at a minimum of every 90 days and depending upon the clinical
status, possibly more often in order to meet the standard of care.

b.     The standard of care requires that [James] be seen and examined
every 90 days and assessed for adverse effects from the amphetamines such as
amphetamine psychosis, elevated blood pressure, weight loss, and assessment of
the cardiovascular system.

c.      The standard of care also requires that appropriate clinical
records be kept in accordance with acceptable professional standards. These
records need to, in order to meet the standard of care, clearly reflect the
patient=s clinical status, the
medicines being received, his emotional or psychological status, his response
to treatment or lack of response and evidence of any adverse effects or the
absence of adverse effects must be documented.

 








2.     The manner in which the care rendered by
the . . . Clinic and its employees and Angela D. Self, M.D. . . . failed
to meet the standard of care and the conduct that is called into question here
is set forth below.  The . . . Clinic and
its employees and the physicians, Angela D. Self, M.D. . . . failed to
examine [James] every 90 days in [an] appropriate timely manner.  During the entire approximately 5 years, as
far as I can tell, he was seen twice at the clinic and possibly a third time.  It is incredible that this man received
amphetamines for approximately 5 years with only three physician visits over
the entire period of time.  The clinic
and the doctors were simply running a mail order prescription mill dispensing
controlled substances in an inappropriate and incorrect way as described
above.  This conduct by the . . . Clinic
and its employees, and Angela D. Self, M.D. . . . is clearly below the
accepted standards of medical care.  The
medical records are such that one cannot be certain what was going on other
than that he was receiving mail order prescriptions.  [Emphasis added.]

This same standard of care was
repeated, specifically mentioning only Dr. Self, in a later section of the
report.

According
to the Clinic,

Rushing fails to specifically describe the standard of care applicable
to Dr. Self, Dr. Mercau, and the . . . Clinic, i.e. what steps should have been
taken and when.  Rushing fails to state
when [James] allegedly should have been examined and what assessments, testing,
or evaluation allegedly should have been done and what such testing and
evaluation allegedly would have shown. 
Rushing fails to set forth when during the medical care he believes
assessments should have been done and then, if such assessments had been
performed, how these assessments would have changed the patient=s condition.

 













Again,
the inclusion of the Clinic in the articulation of the standard of care is not
fatal because all of the claims against the Clinic are based on respondeat
superior and therefore flow from the alleged breach of the standard of care by
its agent or employees, in this case, the doctors.  And although Dr. Self and Dr. Mercau are both
mentioned in one part of the articulation of the standard of care, the standard
of care is later ascribed to each of them separately in different
paragraphs.  See Foster v. Richardson,
No. 02-09-00216-CV, 2009 WL 5191363, at *8 (Tex. App.CFort
Worth Dec. 31, 2009, no pet.) (holding report not insufficient Amerely
because it contains some collective statements regarding actions that both
doctors should have taken while they independently cared for Richardson@);
Romero v. Lieberman, 232 S.W.3d 385, 391B92 (Tex.
App.CDallas
2007, no pet.) (holding that standard of care need not be listed separately in
report when same standard applies to each health care provider). Thus, the
conduct of Dr. Self that the report calls into question is clear:  (a) Dr. Self=s
alleged failure to see James every ninety days during the six month period she
prescribed him Adderall to assess him Afor
adverse effects from the amphetamines such as amphetamine psychosis, elevated
blood pressure, weight loss, and assessment of the cardiovascular system@ and (b)
her alleged failure to keep appropriate medical records during that same time
period. Although Dr. Rushing=s report
does not marshal all the Nicholsons= proof,
it is not required to do so.  Palacios,
46 S.W.3d at 878.  Reading the report in its entirety, it at least
provides a fair summary of Dr. Rushing=s
opinions as to the standard of care applicable to Dr. Self and the manner in
which the care she rendered James failed to meet that standard.  See Barber, 2009 WL 3337192, at
*6.

Based on
the above analysis, we conclude and hold that the trial court did not abuse its
discretion by determining that Dr. Helge=s and
Dr. Rushing=s reports, when read together,
represent a good faith effort to comply with the statutory definition of an
expert report as to Dr. Davisson and Dr. Self regarding the Nicholsons=
allegations of failure to adequately or properly assess, monitor, and treat
James and the continuing prescription of Adderall without timely and properly
seeing James for medical and psychiatric evaluation.  Additionally, because the Nicholsons=
allegations against the Clinic are based on respondeat superior through the
alleged negligence of both Dr. Self and Dr. Davisson, we conclude and hold that
the trial court did not abuse its discretion by determining that the reports
are also adequate as to the Clinic regarding those claims.

Causation

The
Clinic and Dr. Davisson challenge both Dr. Helge=s and
Dr. Rushing=s reports as to causation; Dr.
Self challenges Dr. Rushing=s
causation opinion as well.  According to
Dr. Davisson and the Clinic, Dr. Helge is not qualified to give an opinion on
causation under section 74.403(a) because he is a clinical and forensic
psychologist, not a physician.  Section
74.403(a) provides as follows:








[I]n a suit involving a health care liability
claim against a physician or health care provider, a person may qualify as an
expert witness on the issue of the causal relationship between the alleged
departure from accepted standards of care and the injury, harm, or damages
claimed only if the person is a physician and is otherwise qualified to render
opinions on that causal relationship under the Texas Rules of Evidence.

 

Tex. Civ. Prac. & Rem. Code Ann. ' 74.403(a). 

 

APhysician@ is
defined as a person who is

(1)    licensed to practice
medicine in one or more states in the United States; or

 

(2)    a graduate of a medical
school accredited by the Liaison Committee on Medical Education or the American
Osteopathic Association only if testifying as a defendant and that testimony
relates to that defendant=s standard of care, the
alleged departure from that standard of care, or the causal relationship
between the alleged departure from that standard of care and the injury, harm,
or damages claimed.

 

Id. '
74.001(a)(23) (Vernon 2005).  The
Nicholsons admit that Dr. Helge is not a physician under the statute, but they
contend that he does not need to be qualified to render an opinion on causation
because the causation opinion is provided by Dr. Rushing=s report
and that the two reports together constitute a sufficient report as to standard
of care and causation.

Section
74.351(i) explicitly contemplates the use of multiple expert reports in the
same case:








Notwithstanding any other provision of this section, a claimant may
satisfy any requirement of this section for serving an expert report by serving
reports of separate experts regarding different physicians or health care
providers or regarding different issues arising from the conduct of a physician
or health care provider, such as issues of liability and causation.

 

Id. ' 74.351(i).  Accordingly,
if Dr. Rushing=s report is adequate as to
causation, then Dr. Helge=s qualifications to opine on
causation are of no import.

After
providing a summary of James=s
medical records that he reviewed, and concluding that James Ahad seen
the physician only three times over the last seven years during the time that
he was receiving Adderall,@ Dr.
Rushing opined that

James . . . suffered an addiction to amphetamines due to the failure
to examine him every 90 days.  He also
developed an amphetamine psychosis and his behavior was such as described
earlier to be disruptive such that he lost his employment that he was a threat
to his wife, and a threat to himself and required extensive treatment as a
result of his amphetamine addiction and amphetamine psychosis.  All of this was a result of improper
amphetamine prescription and improper supervision.  Had [he] been examined every 90 days his
addiction would have been diagnosed and treated in a timely manner thereby
preventing his addiction from advancing to psychosis[.]@  [Emphasis added.]

 








Dr. Davisson and the Clinic
contend that this opinion is conclusory in that it Adoes not
set forth any facts demonstrating a mechanism that supports his conclusion@ and
that it requires them to infer the facts supporting the conclusion.  But they ignore the detailed factual summary
set forth in Dr. Rushing=s report.  Dr. Rushing clearly details the doctors= alleged
omissionsCfailure to see James on a
timely, regular basisCas well as the behavior which
James ultimately engaged in and his ultimate diagnosis.  Dr. Rushing thus clearly opines that if the
doctors had seen James in the office, they would have observed the behavioral
manifestations Dr. Rushing described.  Moreover, as the Clinic can
act only through its employees or agents, the Nicholsons=
allegations against the Clinic are likewise supported by sufficient factual
detail and are therefore not conclusory. 
See Benavides v. Garcia, 278 S.W.3d 794, 799 (Tex. App.CSan
Antonio 2009, pet. denied) (holding that causation section of expert medical
report was not conclusory when read in context of entire report).








Dr.
Davisson and the Clinic contend that even if Dr. Rushing=s
causation opinion is sufficient as to the medical doctors, it is nevertheless
insufficient as to Dr. Davisson because it fails to specifically discuss or link
Dr. Davisson=s failure to meet the standard
of care described in Dr. Helge=s report
with James=s resulting injury.  However, after describing that injury in his
report,[10]
Dr. Rushing states specifically that the injury was Aa result
of improper amphetamine prescription and improper supervision.@  [Emphasis added.]  To fulfill the requirements of section
74.351(i) by supplementing Dr. Helge=s report
as to Dr. Davisson, Dr. Rushing was not required to mention Dr. Helge=s exact
description of the standard of care applicable to Dr. Davisson, especially
when, as here, that standard of care is accurately described as a failure to
properly supervise or monitor, which is precisely the conduct that Dr. Rushing
implicates as causing James=s
injuries.  See Packard v. Guerra,
252 S.W.3d 511, 526B27 (Tex. App.CHouston
[14th Dist.] 2008, pet. denied) (holding that we must review multiple reports Ain the
aggregate@ to determine if they are
adequate as to liability and causation); Perez v. Salinas, No.
13-08-00192-CV, 2008 WL 4981565, at *3 (Tex. App.CCorpus
Christi Nov. 25, 2008, pet. denied) (mem. op.). 
Therefore, we conclude and hold that the trial court did not abuse its
discretion by overruling appellants=
objections as to the causation part of Dr. Rushing=s
report.  








And
because Dr. Rushing=s report is sufficient as to
causation, it is of no import that Dr. Helge is not qualified to render an
opinion on causation.  See Tex.
Civ. Prac. & Rem. Code Ann. ' 74.351(i);
Baylor Univ. Med. Ctr. v. Rosa, 240 S.W.3d 565, 570B72 (Tex.
App.CDallas
2007, pet. denied) (holding expert report requirement fulfilled in claim
against nurse by providing expert report of nurse as to standard of care and
expert report of medical doctor as to causation); cf. Walgreen Co. v.
Hieger, 243 S.W.3d 183, 187 (Tex. App.CHouston
[14th Dist.] 2007, pet. denied) (Seymore, J., dissenting).[11]








Having
determined that the trial court did not abuse its discretion by overruling
appellants= objections to Dr. Helge=s and
Dr. Rushing=s reports as to their claims
regarding failure to properly and adequately assess, monitor, and treat James
and the continuing prescription of Adderall without timely and proper
evaluation, and, thus, by refusing to dismiss those claims against them, we
overrule the Clinic=s and Dr. Davisson=s three
issues and Dr. Self=s two issues as to those
claims.  However, neither Dr. Helge=s report
nor Dr. Rushing=s report faults Dr. Davisson=s or Dr.
Self=s
conduct as to the other claims alleged in the Nicholsons=
petition:  the failure to timely and
properly diagnose James and the initial and continuing diagnosis of James with
ADD. Accordingly, we conclude and hold that neither report is adequate as to
those claims and we therefore sustain appellants= issues
to the extent they complain about the reports as to those claims.  See Richardson, 2009 WL 5191363, at
*7.

Conclusion

Having overruled
all of each appellants= issues as to the failure to
adequately monitor and the continuing prescription of Adderall without adequate
supervision claims, we affirm the trial court=s order
as to those claims.  But having sustained appellants= issues
as to the Nicholsons= other claimsCthe failure
to timely and properly diagnose James and the initial and continuing diagnosis
of James with ADDCwe reverse the trial court=s order
as to those claims and remand those claims to the trial court to consider
whether to grant a thirty-day extension to cure the deficiency.  See Tex. Civ. Prac. & Rem. Code
Ann. ' 74.351(c);
Leland v. Brandal, 257 S.W.3d 204, 207 (Tex. 2008); Richardson,
2009 WL 5191363, at *11.

 

 

 

 

TERRIE LIVINGSTON

JUSTICE

 

PANEL:  LIVINGSTON and WALKER,
JJ.

 

DELIVERED:  March 25, 2010











[1]They both sued in their
individual capacities, and Patricia also sued as next friend of the Nicholsons= minor children.





[2]They also sued Dr. Ana
Mercau and Dr. Clifford Charles AChuck@ Ferrell, deceased, and any unknown administrator
of his estate.  Dr. Mercau is not a party
to this appeal, and the Nicholsons nonsuited their claims related to Dr.
Ferrell.





[3]Appellants= answers did not raise
any affirmative defenses as to the respondeat superior allegations.  See Springer v. Johnson, 280 S.W.3d
322, 334 (Tex. App.CAmarillo 2008, no pet.).





[4]Because the Nicholsons
provided two reports to satisfy their expert report obligations as to all
defendants, and because some of appellants= challenges to the reports are interdependent, we
will review appellants= issues by topic rather
than in chronological order.





[5]Additionally, in November
2007, Dr. Helge co-presented a workshop entitled, AIt Looks Like ADHD, It
Sounds Like ADHD, It=s Not ADHD.@  See Foster v. Richardson, No.
02-09-00216-CV, 2009 WL 5191363, at *(will fill in, pg #s not on WL yet) (Tex.
App.CFort Worth Dec. 31, 2009,
no pet.).





[6]Dr. Helge=s report notes that A[t]here is a page in the
records dated 02/26/03 that simply states to whom it may concern, [James]
(patient) was diagnosed with attention deficit disorder on 02/26/03 (date) at
the . . . Clinic. My recommendation is prescription for Adderall
(medication).  Below that are two
signatures.  The first is Chuck Ferrell,
M.S., D.O., general/family practice and Harvey G. Davisson, Ph.D.,
psychologist.@





[7]Although it is unclear who
initially prescribed the Adderall because both Dr. Davisson=s and Dr. Ferrell=s signatures follow the
prescription, it is clear that Dr. Davisson acquiesced in the prescription.





[8]Thus, contrary to Dr.
Self=s contention, this case
is distinguishable from this court=s opinion in Collini v. Pustejovsky, 280
S.W.3d 456, 465B66 & n.6 (Tex. App.CFort Worth 2009, no
pet.).





[9]Moreover, because Dr.
Helge=s report is sufficient as
to the standard of care for Dr. Davisson (and the Clinic, by virtue of the
respondeat superior allegations), there is no need for Dr. Rushing=s report to articulate a
separate standard of care for them or to opine as to how Dr. Davisson may have
breached the standard of care. 





[10]AHe also developed an
amphetamine psychosis and his behavior was such as described earlier to be
disruptive such that he lost his employment that he was a threat to his wife,
and a threat to himself and required extensive treatment as a result of his
amphetamine addiction and amphetamine psychosis.@





[11]Because we determine that
it was not necessary that Dr. Helge=s report provide an opinion on causation, we need
not address the Clinic=s and Dr. Davisson=s contentions that Dr.
Helge=s opinion as to causation
is conclusory. See Tex. R. App. P. 47.1; Horsley‑Layman v.
Adventist Health Sys./Sunbelt, Inc., 221 S.W.3d 802, 809 (Tex. App.CFort Worth 2007, pet.
denied).